WEST COAST LUMBER COMPANY v. EDWIN C. WERNICKE, and ELMORE V. WERNICKE, as co-partners doing business as Wernicke Brothers.

188 So. 357.
Opinion Filed April 25, 1939.

S. *Whitehurst's Sons, D. M. Johnson* and *Cooper & Cooper,* for Plaintiff in Error;

*C. H. Lockhart* and *George W. Scofield,* for Defendants in Error.

THOMAS, J.—In the interest of clarity, the plaintiff in error will be referred to as the defendant and the defendants in error will be referred to as the plaintiffs.

Plaintiffs brought suit against the defendant, the gist of the cause of action, alleged in a declaration of three counts, being that the latter entered into a verbal contract to sell them Texas Seed Ribbon Cane Seed, warranting it to be of the variety represented, and that when the crop approached maturity it was discovered that sixty per cent of it was, in truth, Kaffir Corn; that the one is so similar to the other, it was impossible for the plaintiffs to distinguish between the two at the time of purchase of the seed; that Kaffir Corn was wholly unsuitable for ensilage purposes in the particular territory where planted because it easily molds and spoils, and that the two varieties do not mature simultaneously, with the result that it is impossible to harvest them together, consequently, when this was attempted, either the one was immature or the other was overmature. The crop harvested was averred to have been far short of the one anticipated by reason of the breach of warranty, and damages were claimed because of this and also because of the unfitness of the matured crop for ensilage.

Many pleas were filed to the three counts of the declaration, and the defendants also filed separate pleas to each count. Our examination of the defenses leads us to believe that every issue which could have been presented under the statements made in the declaration were passed on by court and jury.

A verdict was found in favor of plaintiffs for Seventeen hundred and fifty Dollars, and judgment was entered thereon, from which the defendant sued out a writ of error.

It was shown by the testimony that it is difficult for an expert, even to determine from a casual examination, the difference between Kaffir Corn and Texas Seed Ribbon Cane Seed, both belonging to the sorghum family, and it

was established, also, that they strongly resemble each other while growing until the point of maturity is neared. The Texas Seed Ribbon Cane has a head or blossom which opens fully to the sunlight and, therefore, retains little dampness, while the head of the Kaffir Corn does not open so widely, consequently, retains moisture and easily molds.

When the two varieties are planted together and, hence, reaped at the same time, as was done in this case, and are placed in a silo the Kaffir Corn quickly molds and spoils the ensilage.

There was ample testimony to establish that the plaintiffs suffered a loss of at least the amount appearing in the jury's verdict, due to their reliance on the warranty that the seed purchased from the defendant would produce Texas Seed Ribbon Cane which plaintiff intended to use for ensilage.

It was said in Grafton-Stamps Drug Co. v. Williams, 105 Miss. 296, 62 South. Rep. 273:

"A sale of seed by name raises an implied warranty that it is true to name; and the fact that the buyer inspected the seed before purchasing is immaterial, when its character cannot ordinarily be ascertained by any reasonable inspection. Note to Leonard v. Crary Canning Co., 37 L. R. A. (N. S.) 79; 35 Cyc. 409-411; 30 Ency. of Law (2d Ed.) P. 157, par. 7; Id. p. 159, par. 1 of subdivision XI; Id. p. 612, par. 5." 62 South. Rep. text 273.

The decision of this Court in the case of Vaughan's Seed Store v. Stringfellow, 56 Fla. 708, 48 South. Rep. 410, was as follows:

"The defendant's engagement was that the seed sold was the Arlington White Spine cucumber seed and would produce Arlington Whtie Spine cucumbers. The natural consequence of a breach of such a warranty would be a crop of cucumbers different in kind and quality from that guar-

anteed by the defendant. Where, then, the seed produces a crop not harmful to the land, but of a poorer character, or of an inferior quality, and less value then would have been produced had the warranty been fulfilled, the measure of damage is the value of the crop of the true product, such as the seed was warranted to produce, and such as would ordinarily have been produced that year, less the expense of raising it, and less also the value of the crop actually raised from the seed sold; or, in other words, the measure of damage would be the difference between the market value of the crop raised and the crop from the seed ordered. 30 Am. & Eng. Ency. Law (2d Ed.) 219; Wolcott v. Mount, 36 N. J. Law, 262, 13 Am. Rep. 438; White v. Miller, 71 N. Y. 118, 27 Am. Rep. 13; Passinger v. Thorburn, 34 N. Y. 634, 90 Am. Dec. 753; Depew v. Peck Hardware Co., 121 App. Div. 28, 105 N. Y. Supp. 390." 48 South. Rep. text 414.

Applying the rule discussed in these authorities to the facts of the instant case, as we understand them from the testimony upon which the jury had a right to rely, the conclusion is easily reached that plaintiffs suffered damage to the extent of the amount named in the verdict as a direct result of the breach of warranty on the part of defendant. See annotations 16 A. L. R. 859; 32 A. L. R. 1241 and 62 A. L. R. 451.

It seems quite clear that Kaffir Corn and Texas Seed Ribbon Cane are members of the sorghum family, and that the seed of the two plants cannot be distinguished one from the other, even by an expert, except upon minute examination. The character of the two plants is such that they do not require the same period of time for germination and growth to maturity. Where the seeds are planted at the same time, as was done in this case, and a great proportion of the crop is ready for the harvest while the re-

mainder has not reached maturity, it seems that a loss in the tonnage would be inevitable.

The other phase of the claim for damage is based on a difference in the characteristics of the two varieties of sorghum when they do finally mature. Because one retains moisture it easily "sours" when placed in a silo and, of course, spoils the contents.

The damage complained of by the plaintiffs is easily traceable by the testimony to the shortage of tonnage as a result of the mixing of the seeds as well as the spoilage of the entire crop by reason of the admixture.

In his charge to the jury the court admonished them that there was no "claim of warranty as to the quality of the seed, whether or not it would germinate"; that the only claim was "based on its not being the proper kind of seed, not being the seed they bought and which the defendant claimed to sell them."

The court also instructed the jury that the measure of damage would be the difference between the crop actually raised and its value had the seed been true to name, after taking into consideration whether or not proper care was shown by the farmer in growing and harvesting the crop. This instruction seems to have complied with the rule which we have quoted.

It is well to draw attention to the further instruction by the Court, given at the request of the defendant, that there was no liability for the remote or conjectural consequences of the defendants' act and that any recovery should be the natural or approximate result of the defendants' alleged wrong doing.

We have carefully examined the pleadings, the testimony offered to support them and the charges by which the jury were governed in considering and weighing the evidence in the case. After doing so, we find no reversible error, and

believe that the judgment should not, therefore, be disturbed.

It is ordered that the judgment of the lower court be, and it is hereby, affirmed.

TERRELL, C. J., and WHITFIELD, BROWN and CHAPMAN, J. J., concur.

BUFORD, J., dissents.

BUFORD, J. (dissenting).—The writ of error brings for review judgment in favor of plaintiff in a suit wherein damages were alleged to have occurred by resaon of the failure of an implied warranty that certain seed purchased by the plaintiff from defendants were "Texas Seeded Ribbon Cane Seed" when in truth and in fact the seed were a mixture of "Texas Seeded Ribbon Cane Seed" and "Kaffir Corn seed," consisting of about 40% Texas Seed Ribbon Cane seed and the remainder Kaffir Corn Seed and that by breach of such warranty "the plaintiffs suffered great and divers losses in that the said Kaffir corn did not produce the volume and tonnage that would have been produced by Texas Seed Ribbon Cane; that said Kaffir corn is of such nature and character as to be wholly unfit for ensilage purposes i na wet climate, such as usually prevails in the growing season in Hernando County, Florida, and ensilage purposes in a wet climate, such as usually prevails and said Kaffir corn do not reach the proper stage for ensilage at the same time, and being mixed together one or the other of necessity had to be harvested either too late or too early—Wherefore, the plaintiffs say that by reason of the premises they are injured and have sustained damages to the amount of $10,000.00; wherefore, plaintiffs bring this suit and claim damages in the sum of $10,000.00."

The second count of the declaration is like the first except that it further alleges that "on or about March 1, 1935, the said O. C. Dick, authorized agent as aforesaid, did sell and deliver to the plaintiffs a large sack of seed and warranted by him and his principal, the said West Coast Lumber Company, a corporation, to be Texas Seed Ribbon Cane seed, and the plaintiffs being unable to verify the warranty at the time of purchase by any reasonable inspection of said seeds, did then and there accept the said sack of seed upon the warranty of said defendants, and thereafter, to-wit, in the month of March, 1935, did plant said seed for the purpose of producing ensilage; yet said seed contained more than sixty per cent Kaffir Corn seed, and only forty per cent Texas Seed Ribbon Cane seed, thereby causing great and divers losses to the plaintiff in that said Kaffir corn seed caused a shortage in crop of a great many tons of ensilage, to-wit 266 tons, and further loss by molding and spoilage, to-wit 400 tons, all of which losses were directly caused by said defendant's failure to deliver Texas Seed Ribbon Cane seed in accordance with their verbal agreement so to do.

Wherefore, the plaintiffs say that by reason of the premises they are injured and sustain damages to the amount of $10,000.00."

Numerous pleas were filed, some of which, on motion, were stricken.

It is not necessary to discuss or delineate the contents of the pleas which were stricken or of the pleas which remained in the record. It is sufficient to say that the pleas standing, upon which trial was had, were sufficient to raise the general issue.

The plaintiffs proved that they purchased the seed from the defendants as alleged in the declaration; that they planted the seed and when the harvest came on it was dis-

covered that a large percentage of the crop was Kaffir corn; that the crop produced was about 400 tons of ensilage of which about 100 tons was Kaffir corn and the remainder was Texas Seeded Ribbon Cane but that a large quantity of that was damaged as ensilage by reason of having mixed with it the Kaffir corn.

There were several questions presented but it is not necessary for us to discuss them because the record shows that the plaintiffs, by their own conduct, are estopped from alleging damage by reason of any alleged breach of warranty in regard to the seed.

The uncontradicted evidence shows that during the year prior to the year in which the Texas Seeded Ribbon cane seed were planted on the land which had been planted to and had produced a crop of Kaffir corn; that the Kaffir corn had been harvested and used to feed cattle; that the droppings from the cattle so fed were collected to be used for fertilizer and that the field, or major part of it, which was planted to Texas Seeded Ribbon cane was fertilized with this manure; that the manure had in it great quantities of fertile Kaffir corn seed and that where the manure was spread thickest on the land the crop showed the largest proportions of Kaffir corn.

There is no evidence in the record that the seed sold by the defendants to the plaintiffs contained any Kaffir Corn seed except what is shown by the result of the planting and the crop grown on the land. That the manure used on the crop was, as heretofore stated, infested with large quantities of fertile Kaffir corn seed is not disputed but is affirmatively shown.

The record further shows that other seeds sold by the defendants to other parties, received at the same time from the same source, did not contain any Kaffir corn seed.

It is too well settled to be questioned that "on a sale of

seeds there is an implied warranty that the seed are fit to sow and will germinate. If the sale is by the producer there is an implied warranty that the seed are free from latent defects arising from the mode of cultivation and reasonably free from foreign matter. But if a particular kind of seed is purchased by name, the warranty implied is only that the seed is of the kind designated and there is no warranty that the seed will germinate or is fit for the intended purpose." 35 Cyc. 409. See Grafton-Stamps Drug Co. v. Williams, 103 Miss. 296, 62 Sou. 273; Vaughn Seed Store v. Stringfellow, 56 Fla. 708, 48 Sou. 410.

So the theory of the case was tenable but when the evidence shows without contradiction that the plaintiffs planted the seed using as fertilizer on the ground cow manure which was so infested with Kaffir corn seed as to produce large quantities of Kaffir corn, the evidence that Kaffir corn came up along with the product of the seed purchased constitutes no evidence whatever that the seed purchased were a mixture of Texas Seeded Ribbon Cane seed and Kaffir corn seed.

The witness who planted the crop testified that this type of fertilizer was used on the field and he also testified that on a pile of manure like that which he used to fertilize the field. Kaffir corn came up "as thick as hair on a dog's back."

A purchaser who would hold the seller liable on an implied warranty of type of seed sold can not mix with such seed other seeds of a kindred plant and then be heard to complain that the entire crop was not of the type which should have been produced by the seed so purchased.

It is immaterial that the Kaffir corn seed were placed in the ground with the fertilizer and not deliberately planted with the Texas Seeded Ribbon Cane seed. Neither is it

material whether or not the planter-purchaser of the seed knew that the fertilizer was infected with Kaffir corn seed at the time he planted the crop.

In other words, to hold the seller liable, the purchaser must protect him by a proper planting of the seed. In this connection see: 55 C. J., Sales, Sec. 742, p. 778:

"In accordance with the rules as to implied warranties of quality and fitness generally on a sale of seeds there is an implied warranty that the seeds are fit to sow and will germinate *if properly planted * * *"* (Emphasis supplied.)

24 R. C. L., Sales, Sec. 470, p. 199:

"The better view, however, seems to be that in the sale of seed necessarily intended for planting and which is totally unfit for seed is not fertile, a warranty will ordinarily be implied that it is fit for such purpose, that is, that it is reasonable fertile seed and will germinate *if properly planted.* * *"* (Emphasis supplied.)

Western Soil Bacteria Co. v. O'Brien Bros., 49 Cal. A. 707, 194 Pac. 72, was an action brought to recover a balance alleged to be due on the purchase price of certain vetch seed. The defense was that the seed had failed to grow as warranted and was worthless. The Court said:

"The appellant, however, contends that, even if such express warranty was given and made, and even though it formed the chief inducement to defendants for their said purchase, it is not such a warranty as would be enforceable, for the reason that there are other elements which enter into the problem as to whether seed, however reinforced as to its germinating qualities, and however carefully and correctly planted, will germinate and grow to its expected maturity, such as conditions of soil and location, and also the particular climatic conditions of the season of the planting and growth of said seed, which matters, according to the plaintiff's contention, would always be

beyond the control of the vendor of the seed. The difficulty with this contention consists in the fact that, in so far as the matters of soil and location are concrned, the plaintiff knew at the time said warranty was given in just what soil and location said seed was to be planted. It was purchased by defendants for planting in growth as a cover crop within their said orchard, which facts were fully known to plaintiff at the time of said sale. With respect to the seasonal conditions, it is true that this would be beyond the control of the plaintiff; and that if it could be shown that the seasonal conditions of the particular place where and time during which said seed was to be planted and was expected to grow were abnormal and that whatever failure there was in said seed to germinate and grow was attributable to such abnormal conditions, this would be a good defense to the enforcement of such guaranty."

In Depew v. Peck Hardware Co., 121 App. Div. 28, 105 N. Y. S. 390 (aff. 197 N. Y. 528, 90 N. E. 1158) plaintiff purchased alfalfa seed from defendant and planted same. When the crop came up there was a large quantity of trefoil among the alfalfa. In an action to recover damages resulting from the defective seed, defendant proved that there was trefoil along the roadside and claimed that this was the cause of the presence of the trefoil in plaintiff's field. The Court intimated that if this contention had been sufficiently established by the evidence, it would have been a bar to the action.

For the reasons stated, I think the judgment should be reversed.