**SPERRY RAND CORPORATION,**
Appellant,

v.

**INDUSTRIAL SUPPLY CORPORATION,**
Appellee.

**INDUSTRIAL SUPPLY CORPORATION,**
Appellant,

v.

**SPERRY RAND CORPORATION,**
Appellee.

No. 20643.

United States Court of Appeals
Fifth Circuit.

Oct. 5, 1964.

Edward McCarthy, Jr., Jacksonville, Fla., Edward McCarthy, Jacksonville, Fla., McCarthy, Adams & Foote, Jacksonville, Fla., of counsel, for appellant.

Edward I. Cutler, Tampa, Fla., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for appellee.

Before MAGRUDER,* JONES and GEWIN, Circuit Judges.

JONES, Circuit Judge.

The appellant, Sperry Rand Corporation, is a Delaware corporation with its principal place of business in the State of New York. The appellee, Industrial Supply Corporation, is a Florida corporation with its principal place of business in Florida. The amount in controversy exceeds $10,000. The initial forum was the United States District Court for the Middle District of Florida. The basis of federal jurisdiction is diversity of citizenship. Industrial Supply brought an action for the rescission of its purchase from Sperry Rand, by written agreement, of a record-keeping system and equipment. Breach of an express or implied warranty, or both, was asserted, and a fraud claim was founded on the averment that false representations were willfully, recklessly or negligently made by Sperry Rand. The district court rejected the claim that there had been a breach of an express warranty and found against Industrial Supply on the fraud issue. The court found, however, that there had been a breach of an implied warranty, decreed rescission and entered judgment for Industrial Supply, conditioned upon the return of the equipment, for the purchase price, transportation costs, insurance and interest. Sperry Rand has appealed. Industrial Supply has taken a cross-appeal, contending that its judgment should have included an award for its claims for other items of damage.

Industrial Supply is engaged in the business of selling and distributing steel, pipe, equipment, tools, hardware, and other items to industrial, agricultural and other users, doing a large volume of business throughout a large territory, and having its principal place of business at Tampa, Florida. Sperry Rand, through its Remington Rand Univac Division, is in the business of manufacturing, selling and installing business systems and equipment, including automatic electronic data processing equipment. Industrial Supply, desiring to improve its system of paper work and produce its records faster and more efficiently, invited several makers of electronic processing equipment to make surveys and recommendations. Two responses were made, one of them by Sperry Rand. Conferences were held between representatives of Sperry Rand and Industrial Supply. Sperry Rand made a study of the business procedures of Industrial Supply over a period of about three months. In January 1959, Sperry Rand submitted "A Report Prepared Expressly for Industrial

* Senior Circuit Judge of the First Circuit, sitting by designation.

Supply Corp. . . . following a work process survey of your administrative operations, routines, and procedures." The title page of the report, which is sometimes referred to as "the brochure," recited that "It is understood that the recommendations herein are intended only for consideration by your organization and that the detailed operating advantages are obtainable through the integrated utilization of Remington Rand products and services." The brochure listed about seventy procedures, so called, that the RRU (Remington Rand Univac) recommended equipment was intended to execute. Seventeen flow charts were included to show the processes by which the RRU equipment would carry out the procedures. Ten separate items of equipment, having prices ranging from $1,994 for an Alphabetical Punch to $75,000 for a Univac Electronic Computer, were included.

The brochure contained "Recommendations", including the following:

"1. We recommend the use of RRU equipment as the one best suited to a tailor made job for your organization.

"2. We have demonstrated the fact that through the use of RRU punched card procedures and exclusive equipment features, we can produce your records and reports more economically, faster and accurate than your present operation.

"3. We suggest the use of several RRU exclusive machines, namely the Card-O-Matic, the UNIVAC 60 computer, the fast speed Electronic Sorter, the Collating Reproducer, the 100 Sector Alphabetical Printing Tabulator, and other devices incorporated in the equipment for use on your procedures."

The brochure was transmitted to Industrial Supply by a letter signed by two "Univac Representatives" of Sperry Rand. The letter is in the following terms:

"We have completed our study of the phases of your organization that you desire to mechanize, and are submitting our proposal applying fully automatic Remington Rand Univac equipment to your procedures in Order Writing, Invoicing, Inventory, Accounts Receivable, Salesman Commissions, Accounts Payable, Back Ordering, and Purchasing Department activity.

"Our study disclosed that the use of tabulating equipment suggested in this proposal will produce your records and reports with greater speed, uniformity, accuracy, and economy. Using the principle, developed for the Card-O-Matic Punch, of coding, pricing and punching in one operation, without further verification, and the fast extending, comparing, and punching operations of the Univac 60, you will no doubt be able to absorb increased activity on the suggested equipment for a greater volume of business without an appreciable increase in cost.

"We have demonstrated to you our complete interest in formulating, planning, and assisting in installing a system on tabulating equipment tailored to your needs, and your organization's work. Our proposal covers the subject matter thoroughly, but is only the beginning of applying our experience and know how to your routines and procedures.

"We wish to thank you and the personnel in your organization, for the help and assistance they gave us to make this proposal possible. We will be indeed proud to accept your signature on the enclosed contract for equipment, and welcome your organization to the large number of satisfied Remington Rand Customers."

In the pocket of the back cover of the brochure were two forms of agreement between Sperry Rand and Industrial Supply, one being for the use and service of the equipment, which will be referred to as a lease or rental agreement, the other being a contract for the sale of the equipment. The lease agreement,

dated April 3, 1959, calling for a rental of $1,980 per month, was executed. The equipment was delivered to Industrial Supply at Tampa, Florida, in July and August, 1959. It was decided by Industrial Supply, on advice of its accountant it appears, that the equipment should be purchased rather than leased. No rental had been paid. During December 1959, the parties entered into the agreement for the sale of the equipment. The final payment of the sales price was made in February, 1960.

The sales agreement contained a warranty clause obligating Sperry Rand to make adjustments during thirty days after installation and to replace defective parts within ninety days from the date of installation. The final paragraph of the agreement provided that the entire agreement was contained in it, and no representation, except when made in writing by a duly authorized officer of RRU, should be deemed to be a part of the agreement. To the extent these clauses are material they will be hereinafter quoted.

Quite some time was spent in preparing to convert the record-keeping procedures of Industrial Supply from methods previously used to the RRU system. Several additional months were spent by Industrial Supply in using or attempting to use the equipment, during which time it expressed to Sperry Rand its dissatisfaction with the equipment and its functioning. Its discontent was indicated by correspondence and in conference with Sperry Rand representatives. In the early part of 1961 Industrial Supply repudiated the transaction and sought the return of the purchase price and redelivery of the equipment. Sperry Rand attributed the failure of the equipment to give satisfaction to the unwillingness of Industrial Supply's personnel to make it operate efficiently and a desire on the part of Industrial Supply's management, for economic reasons, to get out of the deal. This suit followed. The complaint alleges that Sperry Rand made express and implied warranties that the system and equipment were fit and specially tailored for the use intended and required by Industrial Supply. A breach of the warranty was asserted. Rescission was sought and damages were claimed. Sperry Rand asserted that its representatives, who were said by Industrial Supply to have made representations, were only expressing opinions, that Industrial Supply did not rely upon the statements made to it but made its decision to purchase on the basis of its own investigations. Sperry Rand asserted that the equipment fully performed all that had been promised for it.

The district court found that the statements were representations on behalf of Sperry Rand and not merely the opinions of salesmen, and that the equipment was not reasonably fit for the purpose and use for which it was intended and had been recommended. The court held that the applicable law for the interpretation of the contract was the law of New York, where the contract was made. The court concluded that under the New York law the transaction between the parties gave rise to an implied warranty that the equipment was reasonably fit for the purpose required by the purchaser. Under the law of New York, so held the district court, the integration clause does not exclude or preclude the existence of implied warranties. There was, according to the district court's findings and conclusions, a breach of an implied warranty of fitness which entitled the purchaser to rescind the contract of sale, return the equipment and recover the purchase price and incidental charges and expense. A decree was entered in accordance with the findings and conclusions. Sperry Rand has appealed. Industrial Supply has taken a cross-appeal on the ground that it was entitled to a recovery of damages for incidental charges and exenses in an amount greater than the award of the court.

■ Our first concern is to decide what law governs. The lease agreement contained a clause stating that it was to be construed in accordance with the laws of New York. There is no like clause in the sales agreement. We are

in accord with the view of the district court that the law of Florida, as the law of the forum, determines the applicable conflicts of law rules. Klaxon Company v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The district court stated that "under Florida law the interpretation of the contract of sale between the parties and the applicable law of sales is determined by the law of the place" of contracting, that is, by the law of the State of New York. The Supreme Court has stated, as the general conflicts rule pertaining to contracts, that matters bearing upon the execution, interpretation and validity of a contract are determined by the law of the place where it is made; matters connected with its performance are regulated by the law prevailing at the place of performance; and matters respecting the remedy depend upon the law of the place where the suit is brought. Scudder v. Union National Bank, 91 U.S. 406, 23 L.Ed. 245. This statement of principle has been approved by Florida courts. Walling v. Christian & Craft Grocery Co., 41 Fla. 479, 27 So. 46, 47 L.R.A. 608; Castorri v. Milbrand, Fla.App., 118 So.2d 563.

■■ These rules, however, are not decisive of the conflicts question here presented. An implied warranty, the basis for the relief here granted, is an incident of the sale. It arises apart from and independent of the contract of sale from the nature of the transaction and the situation of the parties. While the implied warranty arises independently, nevertheless, as a warranty, it is a contractual right. Hector Supply Co. v. Carter, Fla.App., 122 So.2d 22; Carter v. Hector Supply Co., Fla., 128 So.2d 390; Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313. Although there may be an express contractual disclaimer of any implied warranty, and a warranty is not to be implied where inconsistent with a valid contractual provision, we think our tenet of conflict of laws must be that which governs sales, rather than the general rules applicable in contract situations. Professor Ehrenzweig has said:

"The scope of the parties' obligations at the time of the alleged breach or discharge may be affected by events subsequent to the conclusion of the contract. Conflicts questions have perhaps arisen most frequently concerning damages for alleged breaches of implied warranties. To treat such warranties as a part of the parties' original obligations, is a fiction perhaps innocuous for the domestic law of contracts. But it would be most unfortunate to give reality to this fiction in the law of conflict of laws by subjecting to the 'law of the contract' the question whether a seller is liable for defective goods by virtue of an implied warranty of fitness." Ehrenzweig on Conflict of Laws 497, § 187.

The only decision of a Florida court which has come to our attention involving a question as to the law applicable in an action on an implied warranty is Farris & Co. v. William Schluderberg, etc. Co., 141 Fla. 462, 193 So. 429, reh. den. 142 Fla. 765, 196 So. 184. A Florida vendor agreed by a contract executed in Maryland to sell and deliver in Maryland meat to be shipped from Florida. The place of contracting and the place of performance were the same. The court held that the contract was "a Maryland one, governed by the law of that State." There is no indication whether the court regarded the law of the place of contracting or the law of the place of performance as providing the substantive rules for decision. In Pennsylvania the law of the place of performance would govern. Victorson v. Albert M. Green Hosiery Mills, Inc., 3rd Cir. 1953, 202 F.2d 717, 41 A.L.R.2d 806; Texas Motorcoaches v. A.C.F. Motors Co., 3rd Cir. 1946, 154 F.2d 91. Such is also the rule of Delaware. Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 3rd Cir. 1951, 190 F.2d 817. The same doctrine is said to apply in Ohio. Delta

Tank Manufacturing Co. v. Weatherhead Co., D.C.N.D.Ohio, 150 F.Supp. 525, aff. 6th Cir. 1958, 254 F.2d 602. In New York the newly developed center of gravity theory would be applicable. Royce Chemical Co. v. Sharpless Corporation, 2nd Cir. 1960, 285 F.2d 183; Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R. 2d 246.

The modern text writers seem to favor the application of the law of the situs of the property at the time of the sale. See 15 C.J.S. Conflict of Laws § 18d, pp. 929–930, 11 Am.Jur. 355, Conflict of Laws § 69; 2 Beale, Conflict of Laws 981 et seq., §§ 255.5, 256.1–258.1; Lalive, Transfer of Chattels in the Conflict of Laws 48–59, 142; Carnahan, Tangible Property and the Conflict of Laws, 2 U. of Chi.L.Rev. 345; Rest.Conflict of Laws §§ 255–259. The Reporter for the American Law Institute proposes to adopt new language covering contracts to sell interests in chattels and injects a new term, the place where the seller is "to surrender" the chattel, which would fix the governing law unless the center of gravity doctrine requires another law to be applied. Rest. Conflict of Laws 2d Tentative Draft No. 6 (1960) § 346g. However, no change is proposed in the rule that questions arising from a sale, as distinguished from a contract to sell, are to be governed by the law of the situs. Id. Comment a. In Florida Jurisprudence it is said, "It is stated generally that every state has the right to regulate the transfer of property within its limits and that the law of the situs in general controls the transfer of personalty." 6 Fla.Jur. 208, Conflict of Laws § 25.

■ But whether the applicable substantive law is that of the situs, the place of performance or the center of gravity is immaterial, as the law of Florida would be selected by any of these conflict of laws principles. The district court was of the opinion that the law of New York, the law of the place of contracting, controlled. The court followed the conflicts rule for ascertaining the substantive law in determining validity of and in construing contracts generally. We think the district court was in error in its choice of the applicable law, but it does not, of course, follow that its judgment was wrong.

■ The appellate courts of Florida with an occasional contribution from this Court, have fully participated in the development of the doctrine of implied warranty of fitness for a disclosed purpose. At common law the doctrine of caveat emptor applies to all sales unless there is an express warranty of the seller or a warranty is implied by operation of law. Valdosta Milling Co. v. Garretson, 5th Cir. 1954, 217 F.2d 625. In an early decision, the Florida Supreme Court quoted from Benjamin on Sales and stated the following rule:

"[W]here a person contracts to supply an article in which he deals for a particular purpose, knowing the purpose for which he supplies it and that the purchaser has no opportunity to inspect the article, but relies upon the judgment of the seller, there is an implied condition or 'warranty,' as it is called, that the article is fit for the purpose to which it is to be applied." Berger v. E. Berger & Co., 76 Fla. 503, 511, 80 So. 296, 299.

The rule was reiterated and the Berger case was cited in the most recent of the Florida implied warranty cases. Green v. American Tobacco Co., Fla. 154 So.2d 169. In Smith v. Burdines, Inc., 144 Fla. 500, 198 So. 223, 131 A.L.R. 115, the same rule was announced, and in its opinion the court stressed the requirements that the seller be possessed of a superior knowledge of the articles sold, that the seller knows of the particular purpose for which the articles are required, that the buyer relies upon the skill and judgment of the seller, and that the seller is aware of such reliance by the buyer. See Atlantic Distributors, Inc. v. Alson Manufacturing Co., Fla.App., 141 So.2d 305. The evidence here clearly establishes the knowledge of Sperry Rand as to the particular purposes for which Industrial Supply desired to purchase the equipment, and the reliance by the buyer upon

the judgment of the seller. The admissibility of this evidence, under the parol evidence rule, will be later considered. We accept the determination of the district court that the equipment was not fit and suitable for the intended purpose and that it did not perform the required functions in accordance with the known purpose.

■■ The judicial opinions, in sometimes stating the doctrine of implied warranty, confine it to situations where the buyer lacks an opportunity to inspect the subject matter of the sale. Lambert v. Sistrunk, Fla., 58 So.2d 434; Smith v. Burdines, Inc., supra; Berger v. E. Berger & Co., supra. Sperry Rand invokes this restriction upon the rule and stresses the length of time the equipment was in the possession of Industrial Supply under the lease before the purchase was made, and the opportunity which it might have had for further inspection before buying by remaining a lessee for a further period. It is only where an inspection would have revealed to the purchaser that the subject of the purchase was not fit or suitable for the intended purpose that the implied warranty may not be relied upon. Cf. West Coast Lumber Co. v. Wernicke, 137 Fla. 363, 188 So. 357; Tampa Shipbuilding & Engineering Co. v. General Construction Co., 5th Cir. 1930, 43 F.2d 309, 85 A.L.R. 1178. Industrial Supply did not know and could not be expected to ascertain, except by use and experiment, the functional abilities and capacities of the electronic equipment, with its transistors, tubes and diodes, its varicolored maze of wiring, its buttons and switches, and the supplementing of machines and devices for the punching of cards and others for the sorting thereof. And, of course, the personnel of Industrial Supply could not be expected to understand the processes by which a set of these modern miracle-makers perform their tasks. Whether the trial use of the equipment was an inspection or its equivalent we need not decide. We see no merit in the contention that the termination of the lease by the purchase of the equipment oper-

ated in some fashion as a rejection of the opportunity of continuing the inspection. The substantial rights of the parties, we think, were the same as if there had been no intervening lease. An inspection, if required, could have been made after the sale had been completed as well as before.

■■ By a clause in the sales contract captioned "Warranty" Sperry Rand undertook to make necessary adustments during a thirty-day period, and to replace broken or defective parts, with some exceptions, during a ninety-day period. The final clause of the contract, designated "General," provided that:

> "The entire Agreement between the parties with respect to the subject matter hereof is contained in this Agreement and no representation, except when made in writing by a duly authorized officer of RRU, shall be deemed to be part of this Agreement, nor shall this Agreement be deemed or construed to be modified, amended, rescinded, cancelled or waived in whole or in part, except by a duly executed written agreement of the parties hereto or their lawful successors."

It is urged by Sperry Rand that the express warranties of the sales contract exclude any implied warranties. This contention would be sound if the express warranties were of the same kind as the asserted implied warranty and were inconsistent with it. Rozen v. Chrysler Corporation, Fla.App., 142 So.2d 735; Cohen v. Frima Products Co., 5th Cir. 1950, 181 F.2d 324; Steinhardt v. Consolidated Grocery Co., 80 Fla. 531, 86 So. 431. Here the express warranty is for the making of adjustments and the replacement of broken and defective parts while the asserted implied warranty relates to fitness for use. There is no inconsistency. In such a case the implied warranty is unaffected by the express warranty. Posey v. Pensacola Tractor & Equipment Co., Fla.App., 138 So.2d 777. The case of Hector Supply Co. v. Carter, supra, is to be distinguished by factual differences from the

Posey case and this case. The express warranties of the contract are not inconsistent with and do not exclude an implied warranty of fitness for a known purpose.

■ It is strongly and plausibly argued by Sperry Rand that the integration clause, so called, of the sales contract precludes any recovery by Industrial Supply on an implied warranty. If the general clause had expressly provided that there were no implied warranties the position of Sperry Rand would be sound. Miami Line & Chemical Co. v. York Ice Machinery Co., 5th Cir. 1939, 104 F.2d 312. But it did not so provide, and while there are authorities holding contra, the majority and, we think, the better reasoned rule is that a contract clause that all agreements are contained in the writing does not operate to bar recovery on an implied warranty of fitness for use. 46 Am.Jur. 518, Sales § 335; 77 C.J.S. Sales § 317b., p. 1164.

■ But, says Sperry Rand, the representations as to fitness for use were written and were excluded as express representations by the integration clause. How, asks Sperry Rand, can there be an actionable implied warranty of fitness for a specific purpose when its representations as to fitness are not actionable because of the integration clause. The question presented is, it seems, a different phrasing of the parol evidence rule. This rule is not procedural but is substantive, and the Florida law will apply. Under the rule, when the parties have reduced their agreement to writing, evidence as to other prior or contemporaneous transactions or undertakings is immaterial with respect to the matters covered by the written contract. Milton v. Burton, 79 Fla. 266, 89 So. 147; Ramey v. Koons, 5th Cir. 1956, 230 F.2d 802. As has been said, while there may be a valid express disclaimer of an implied warranty, the right to assert such a warranty is not precluded by express warranties which are not inconsistent, and since the implied warranty arises independently of the contract of sale, it is not to be rejected because of an integration clause. The contention of Sperry Rand has been answered by the Supreme Court of Florida in saying:

"The fact that a contract of sale is in writing does not necessarily exclude warranties that may be implied by law; and where the alleged verbal warranty sought to be established is only what would be implied, evidence thereof does not change the legal effect of the contract, and is therefore admissible." McDonald v. Sanders, 103 Fla. 93, 137 So. 122. Cf. Hoskins v. Jackson Grain Co., Fla., 63 So.2d 514.

■ The rule that there is no implied warranty of fitness where a known, described and definite article is purchased by its trade name is relied upon by Sperry Rand. There may be some question as to whether the Florida courts would follow this doctrine. See 46 Am.Jur. 527, Sales § 344, and Leverette v. New London Ship & Engine Co., 5th Cir. 1928, 24 F.2d 524. Assuming that the Florida courts would apply the rule, we think the situation presented by this case is not within it. The transaction between Sperry Rand and Industrial Supply was not the sale of a single item. It was of the ten items to which reference has been made, incorporated into a system intended to be tailored to the needs of Industrial Supply. The operational functions of these ten machines were keyed together in a manner intended to meet the accounting and record-keeping requirements of the buyer. They were tailored by Sperry Rand's "know how" for the particular needs of Industrial Supply. There is no difference in principle between the incorporating of specifically described machines into an integrated system and the building of a specially designed single piece of equipment for a like purpose. The sale of a group of specifically described machines, which have been combined into an integrated system, specially arranged for the purchaser, is not to be exempted from the otherwise applicable operation of the doctrine of implied warranty on the ground

that the machines comprising the system are patented and have been designated by trade names.

■ It is urged by Sperry Rand that the failure of the equipment to meet the needs of the buyer resulted, not from any inadequacy of the equipment, but because Industrial Supply did not operate the equipment as recommended and planned. The district court found that "Despite reasonable compliance by plaintiff with defendant's original and further recommendations and reasonable efforts by plaintiff to make the system function satisfactorily, the defendant's system continued to be deficient." The district court further found that "During December, 1960, and January, 1961, it first became evident to plaintiff that, notwithstanding any and all reasonable efforts which plaintiff had made and might be expected to make, defendant's system would not function· as previously represented by defendant, or as needed by plaintiff in its business. * * *" No useful purpose would be served by a recital of the evidence upholding these findings. It is enough to say that they are fully supported and hence are not to be set aside. Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A.

■ Having reached the conclusion that none of Sperry Rand's assignments of error can be sustained, we turn to the cross-appeal of Industrial Supply. It asserts that the award of damages was insufficient as a matter of law. The district court decreed that the buyer could rescind, return the equipment to the seller and have judgment for the purchase price of the equipment and accessories, for the amounts expended for transportation, and for interest. The court rejected the claims of Industrial Supply for forms and supplies, the travel and moving expense of and the rental of an automobile for Robert C. Castle, an employee

hired to supervise the installation and operation of the Univac Card-O-Matic equipment, the salary paid to Castle, part of the salary paid to Henry Gardner, and the salaries of other personnel used on the equipment, construction costs, additional insurance premiums and storage expense. As Industrial Supply states in its brief, "These items were disallowed to plaintiff, not because they had not been expended or incurred, but evidently because the trial judge felt that plaintiff had consumed or otherwise benefited from them." To recover for an asserted loss, the plaintiff has the burden of proving the fact, the cause and the extent of such loss. McCormick on Damages 53, § 14. In a sales warranty case the Supreme Court of Florida has announced these principles:

"It may be stated as a general rule that the party is entitled to compensation for an injury to his person, in his property or in his reputation. There is another general rule that a person is not liable in damages for the remote consequences of his act or conjectural consequences. Damages, to be recovered, must be both the natural and proximate consequence of the wrong complained of. The wrongdoer must answer in damages for those results injurious to other parties which are presumed to have been within his contemplation when the wrong was done." Vaughan's Seed Store v. Stringfellow, 56 Fla. 708, 720, 48 So. 410, 414.

See West Coast Lumber Co. v. Wernicke, supra; Booth Lumber & Loan Co. v. Sewell Paint & Glass Co., 5th Cir. 1928, 24 F.2d 104.

■ The arguments made by Industrial Supply in support of the disallowed portion of its claim for damages, set forth in part in the margin,[1] seem

---

[1] "Any thought that plaintiff might have benefited by the use of defendant's equipment or the above enumerated out-of-pocket expenses is dispelled by the failure of the system and the resulting, unmeasured, loss of business, customer dis-

satisfaction, and personnel problems. These items were not susceptible of proof sufficiently definite to sustain an allowance of damages for loss of profits and employee morale, but they did contribute to the uselessness of defendant's sys-

to us to demonstrate pretty well the correctness of the district court's conclusion as to the rejected items. While the court found that the equipment did not function as impliedly warranted and hence the buyer was entitled to rescind, nevertheless the equipment was used, some of the supplies were consumed in use, and there was some service rendered by the personnel who worked with the equipment. The evidence does not show the extent of the admitted benefit of the buyer from these payments, and the absence of evidence to prove the damage is not supplied by conjectural assertions regarding loss of business, customer dissatisfaction, and personnel prob-

tem in plaintiff's business and establish the valueless nature of the unreimbursed out-of-pocket expenses.

"It is undenied that the office equipment or supplies consisting of binders, tabs, forms, racks, files, and envelopes are specially useful to plaintiff only in connection with defendant's system. Gardner referred to them as expendible supplies. * * * The Court may judicially notice that electronic data processing forms and other such supplies are of no value in manually operated record-keeping systems.

"Castle's traveling and moving expense, the travel expenses of other prospective specialists, as well as Castle's salary in his efforts to install and supervise the operation of defendant's system, were obviously of no value to plaintiff, since it derived no value from the system. The same is true of the automobile rented for his use, of the extra personnel employed and of the overtime payments, all of which expenses are attributable only to plaintiff's reasonable efforts to make use of defendant's system.

"Even the calculated portion of Gardner's salary, which was allocated to cover his time consumed as a result of defendant's breach of warranty, should be upheld. Although defendant's right to cross-examine Gardner was reserved, no cross-examination was made as to his allocation of his salary. Thus the account remains unchallenged in the record.

"The requested construction costs were

lems. The construction cost of remodeling a room to house the RRU equipment was shown to be $8,324.84. The contractor testified that the only actual permanent improvement to the building was partitions of the value of $400. Whether or not the construction work on the building was a proper item for consideration in determining damages, it can be said that there was no certainty of proof as to the amount of the loss when no salvage credit was given for a two-ton air-conditioning unit which the contractor had installed. We find no error in the district court's award of damages.

The judgment of the district court is affirmed.

fully explained. A room was altered and remodeled at defendant's specifications, with a large air-conditioning unit as required for the maintenance of special humidity and temperature control, with special bracing to support the heavy weight of the equipment, special wiring and special sound-conditioning, and partitioning. The area had been previously used for dead storage with a window air-conditioner sufficient for personnel comfort. It is now being used as a control room and location for plaintiff's ditto system for which the alterations and remodeling were unnecessary and useless. The requested sum for useless construction costs was part of a larger bill from the contractor. In the contractor's uncontradicted opinion the maximum salvage value, representing what was actually a useful improvement to the building was $400.00.

"One of plaintiff's major complaints is that defendant's heavy and bulky equipment has been occupying valuable space and requiring care, as well as insurance coverage, since rescission on February 1, 1961. Gardner's estimate was that $500.00 per month was the cost of space, protective precautions and insurance premiums totalling $7,000.00 at the time of trial. Despite plaintiff's demand that defendant take over the equipment at the end of January, 1961, and since then defendant has refused to do so. Hence, the storage protective care, and insurance outlays are continuing.